IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Hundley Ford, Jr., | ) | |
| --- | --- | --- |
| | ) | Case No. 15 C 09778 |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael Lamb, Acting Warden, Stateville | ) | Judge Philip G. Reinhard |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

For the following reasons, petitioner's 28 U.S.C. § 2254 petition to reduce his sentence [1] is denied. The court declines to issue a certificate of appealability. The matter is terminated.

## STATEMENT-OPINION

This matter pertains to the 28 U.S.C. § 2254 petition petitioner Hundley Ford, Jr. filed in this court, challenging his 2007 Illinois criminal conviction for attempted murder, aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a firearm by a felon. Petitioner argues that his appellate counsel on direct appeal was ineffective for failing to argue that the prosecution at trial had fabricated a demonstrative exhibit diagram in a way that did not reflect the evidence.

The charges resulted from a domestic violence incident in and outside petitioner's apartment in which petitioner fired several shots, including one that hit his wife, Wanda Ford. Wanda Ford had given multiple statements and testimony regarding the events in question, which essentially took place in three phases. First, the initiation of the altercation; second, the altercation in petitioner's apartment; and third, petitioner's actions after she left the apartment.

In all accounts, Wanda Ford was consistent about the first phase. She had arrived at petitioner's apartment, at his request, in a car with two other persons. She entered the apartment alone, where she had an altercation with petitioner. Petitioner pulled a gun from his pants and she charged him. During the struggle, the pair moved into petitioner's bedroom while petitioner told her that he was going to kill her.

However, Wanda Ford's account of the second phase varied. Shortly after the incident occurred, she told detectives that the gun first discharged while she and petitioner were on the box spring in his bedroom, petitioner fired a second time and shot her while she was standing up,

1

he shot at her a third time as she left the bedroom, and again a fourth time while she was exiting the apartment. Wanda Ford testified consistently with this story at petitioner's preliminary hearing, at which time the prosecution first introduced a diagram with gunshot indications based on her testimony. The diagram, labeled exhibit PH13, showed four gunshots in the apartment, including three gunshots in the bedroom area and one by the front door. At trial, however, Wanda Ford initially testified that the gun discharged once while she and petitioner were struggling on the box spring and once as she was exiting the apartment. On cross examination, she then clarified that the gun was fired twice in the bedroom and once as she was exiting the apartment.

Finally, in all accounts Wanda Ford was consistent about the third phase of the altercation with petitioner. After Wanda Ford fled the apartment, petitioner fired two shots into the car as she was approaching it. Not being able to get inside the car, she played dead on the ground. She heard petitioner say her name and then the click of a gun without ammunition failing to fire.

During the prosecution's case-in-chief at trial, as noted, Wanda Ford initially testified that there had been two shots in the apartment, and on cross examination testified that there had been three shots in the apartment. The state played the recording of Wanda Ford's testimony during the preliminary hearing, suggesting four shots in the apartment, and introduced the PH13 diagram, which indicated three shots in or around the bedroom and one by the front door. On the other hand, despite introducing the preliminary hearing testimony and PH13, the prosecution repeatedly referenced Wanda Ford's trial testimony that there had been three shots fired in the apartment. Notably, however, state investigators recovered physical evidence of only two gunshots fired in the apartment. On the other hand, the officers testified that physical evidence of a gunshot is not always recoverable at every crime scene.

Following the prosecution's case-in-chief, petitioner testified that he had no intent to kill Wanda Ford. For support, he testified consistently with the physical evidence recovered at the scene that the gun discharged only two times in the apartment. According to petitioner, the gun fired once accidentally in the bedroom while he was struggling with Wanda Ford and once while he fired a "warning shot" down the stairs as she was leaving the apartment. He also testified that he fired the gun twice outside the apartment when he panicked and fired into the car, believing that he saw one of the occupants holding a gun and swinging around toward him. During arguments, defense counsel referred to the number of gunshots fired in the house as a "gray area." *See* [23-17] at 6. Following trial, as noted, petitioner was convicted of attempted murder (against Wanda Ford), aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a firearm by a felon.

Petitioner appealed his conviction in state court, arguing in relevant part that the prosecution knowingly used false evidence in his trial by presenting and relying on the testimony of Wanda Ford at trial that there were three shots fired in the apartment. Petitioner argued that this was contradicted by the physical evidence, which only suggested two shots fired in the apartment. The Illinois Appellate Court upheld the conviction. *See* [23-10]. The appellate court

noted that the prosecution's repeated reference to three shots being fired in the apartment was consistent with at least some versions of Wanda Ford's testimony, and as such it was not "falsified" evidence. Further, in rejecting petitioner's argument regarding the physical evidence, the appellate court noted that there was testimony by officers at trial that not all projectiles fired can be recovered at every crime scene. *See* [23-10] at 24. A PLA to the Illinois Supreme Court was denied.

Petitioner later filed a state court petition for postconviction relief, arguing in relevant part that the prosecution had falsified evidence by improperly using the PH13 diagram based on Wanda Ford's preliminary hearing testimony, which they knew to be contrary to the physical evidence. Petitioner also challenged his appellate counsel for failing to raise this claim on his direct appeal.

The trial court denied the postconviction petition. *See* [23-14]. The Illinois Appellate Court affirmed. *See* [23-17]. The appellate court noted that appellate counsel on direct appeal had raised a nearly identical issue on direct appeal, namely that the prosecution falsified evidence by improperly relying on Wanda Ford's testimony that there were three shots fired, despite the physical evidence only supporting two shots. The underlying theory of both claims was that the prosecution improperly relied on evidence of more than two shots when its physical evidence only supported two shots. The appellate court concluded that petitioner's preferred issue regarding PH13 was no more persuasive than the one direct appeal appellate counsel actually raised, and therefore counsel could not be found deficient. *See id.* at 17-18. The appellate court next found that petitioner was not prejudiced by his direct appeal appellate counsel's failure to raise the PH13 diagram issue because the record did not show that the diagram was falsified or that the prosecution knew it was falsified. Diagram PH13 indicated four shots fired in the apartment, while the prosecution repeatedly referred to three shots fired, but both were based on Wanda Ford's testimony at various times. Thus, diagram PH13 was not falsified evidence. Further, the appellate court again found that petitioner's argument regarding the investigator's failure to find evidence of more than one gunshot in the apartment was insufficient, especially given officers' testimony at trial that not all evidence of gunshots will be recoverable in every crime scene.

Following the denial of his state postconviction petition, petitioner filed a § 2254 in this court, reiterating his argument that his direct appeal appellate counsel was ineffective for failing to argue that the prosecution had falsified the PH13 diagram.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the decision under review is the Illinois Appellate Court's ruling in petitioner's habeas case, "the last state court that substantively adjudicated [petitioner's] claim." *See Alston v. Smith*, 840 F.3d 363, 367 (7th Cir. 2016). Under AEDPA, a reviewing court may only grant habeas relief if the state court's adjudication of the claim:
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Julian v. Bartley*, 495 F.3d 487, 492 (7th Cir. 2007). When assessing the first prong:

A state court decision contradicts clearly established law if it applies a legal court unreasonably applies Supreme Court precedent if it identifies the correct legal rule but applies it in a way that is objectively unreasonable.

*Rodriguez v. Gossett*, 842 F.3d 531, 537 (7th Cir. 2016). When assessing the second prong, "[i]n assessing the reasonableness of the state court's decision, the federal court assumes that the state courts' factual determinations are correct unless the defendant rebuts them with clear and convincing evidence." *Julian*, 495 F.3d at 492.

Here, petitioner raises a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). The standards for such a claim are well established in the Seventh Circuit:

In *Strickland*, the Supreme Court established a two-part test for adjudicating ineffective assistance of counsel claims that requires a petitioner to show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced his defense. To establish deficiency, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Rodriguez*, 842 F.3d at 537-38 (internal quotations omitted). "Under AEDPA, the bar for establishing that a state court's application of the *Strickland* standard was "unreasonable" is a high one. When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotations omitted). More specifically, with regard to a claim that appellate counsel was ineffective for failing to raise specific issues on appeal, the Seventh Circuit has held that "appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised. Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult because the comparative strength of two claims is usually debatable." *Id.* at 898 (internal quotations omitted).

In *Makiel*, the petitioner argued that appellate counsel was deficient by only raising three issues, failure to suppress the petitioner's pretrial statement, the prosecutor's closing statements, and the exclusion of a defense witness's testimony. The petitioner argued that his appellate counsel should have raised the issue of the exclusion at trial of a government witness's pending and relevant criminal forgery charge, which would have provided "critical impeachment evidence" against the witness "because it would have caught [the witness] in a blatant lie, shown that he had an incentive to seek favor with the government, and revealed that he had been accused officially of deception." *Id.* at 899.

4

The Seventh Circuit in *Makiel* declined to grant relief, noting that under AEDPA substantial deference was required to both appellate counsel's decision-making process and the state appellate court's initial review. The Seventh Circuit's review of the appellate counsel's actions did not reveal a scenario where the "claim actually raised was so weak that pursuing it was the equivalent of filing no brief at all." *Makiel*, 782 F.3d at 899. After reviewing the state court's decision, the Seventh Circuit found that:

> The state court's decision that appellate counsel's performance was not deficient for failing to appeal the forgery issue was a reasonable application of *Strickland*. Although we agree with [petitioner] that this issue was an obvious issue to appeal, we disagree that it was so clearly stronger than the issues actually raised that the state court was required to find ineffective assistance of counsel under *Strickland*. On the record before the state court, it was reasonable to conclude that appellate counsel reasonably decided not to raise this issue because she predicted that the error might well be deemed harmless. Even if appellate counsel's prediction might have been incorrect (which we do not decide), there is at least a reasonable argument that counsel satisfied the deferential *Strickland* standard, which means that we may not disturb the state court conviction on this ground under AEDPA.

*Id.* (internal citations omitted).

Here, petitioner's claim is even weaker than that in *Makiel*. Unlike in *Makiel*, where the issue foregone on direct appeal was distinct from those issues actually raised, here the Illinois Appellate Court reasonably found that the issue of PH13 was not "clearly stronger" than the "falsified evidence" issue that petitioner's appellate counsel had raised on direct appeal because the claims were functionally identical. Both claims rested on the argument that the prosecution's reliance on Wanda Ford's testimony about the number of shots fired in the apartment was improper due to the physical evidence, which only supported two gunshots in the apartment. This court agrees with that reasoning, and as such, finds that the Illinois Appellate Court's decision that petitioner had failed to show deficient performance of direct appeal appellate counsel was a reasonable application of the deferential *Strickland* standard. In addition, the Illinois Appellate Court reasonably found that there was no prejudice to petitioner, because even if the issue had been raised on direct appeal, it likely would have failed given officers' testimony at trial that not all evidence of gunshots can be recovered at every crime scene. This court agrees with that reasoning, and as such finds that the Illinois Appellate Court's decision that petitioner had failed to show prejudice was a reasonable application of *Strickland*. Because the Illinois Appellate Court reasonably applied Supreme Court precedent in rejecting petitioner's habeas claims, this court may not grant habeas relief and petitioner's § 2254 petition must be denied.

While petitioner attempted to raise constitutional issues in his § 2254 petition, the court finds his collateral claims are without merit and does not find that "reasonable jurists could debate whether . . . the petition should have been resolved in a different matter[.]" *Id.* Thus, because there is no substantial constitutional question for appeal, the court declines to issue a certificate of appealability. The matter is terminated.

Date: 01/10/2017				ENTER:

_____
United States District Court Judge

Notices mailed by Judicial Staff. (LC)